# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| JOHN D. MILLER,                    ) | |
| )  | |
|     Plaintiff,                    ) | |
| )  | |
|     v.                              ) | Case No. 4:12-CV-01251-AGF-NAB |
| )  | |
| CAROLYN W. COLVIN,[1]            ) | |
| Acting Commissioner of Social Security,   ) | |
| )  | |
|     Defendant.                    ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff John D. Miller ("Plaintiff") was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. '' 401-434, or Supplemental Security Income under Title XVI of the Act, *id.* '' 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall be affirmed.

## I.      Procedural Background

Plaintiff filed his applications for disability insurance benefits and SSI on

February 20, 2009, alleging a disability onset date of August 9, 2007, at which time he

---

[1]   At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security.  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party.  Fed. R. Civ. P. 25(d).  Later proceedings should be in the substituted party's name and the Court may order substitution at any time.  *Id.*  The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

was 43 years old.  (Tr. 289.)  The Social Security Administration ("SSA") denied

Plaintiff's claim and he filed a request for a hearing before an Administrative Law Judge

("ALJ").  (Tr. 147-159.)  The SSA granted Plaintiff's request and the hearing took place

on August 3, 2010. (Tr. 69-143, 227-231.)  The ALJ issued a written decision on October

18, 2010, concluding that Plaintiff had the residual functional capacity (ARFC@) to

perform certain jobs that were available in the national economy, and was thus not

disabled under the Act.  Plaintiff=s request for review by the Appeals Council of the

Social Security Administration (ASSA@) was denied on May 8, 2012.  Plaintiff has thus

exhausted all administrative remedies and the ALJ=s decision stands as the final agency

action now under review.

 Plaintiff argues that the ALJ=s decision is not supported by substantial evidence in

the record.  Specifically, he asserts that the ALJ failed to give controlling weight to the

opinion of Dr. Buckles, a treating physician.  Plaintiff further argues that the ALJ

improperly discredited his testimony and the testimony of another witness, Ms. Stout.

Third, Plaintiff contends that the ALJ's RFC determination was not supported by

evidence in the record.  Finally, he asserts that the hypothetical presented to the

Vocational Expert ("VE") was improper, because it failed to include all of his

impairments.

 Plaintiff asks that the ALJ=s decision be reversed and remanded for the award of

benefits or for proper consideration by a different ALJ.

## II.     Work History and Application Forms

From 1988 to 2007, Plaintiff held jobs in construction, heating and cooling, plumbing, mechanics, and temporary jobs such as landscaping and brickwork.  While working at a service station, Plaintiff changed oil and tires, handled tire balancing and front end alignments, and occasionally performed cashier duties.  While working at a factory, Plaintiff handled 60-pound bags of feed and occasionally 85-pound bags. Plaintiff also held positions working as a telemarketer and a salesman, and positions performing electrical wiring, installing heating and air conditioning, doing duct work, and doing plumbing work.  (75, 78, 80, 81, 83-90.)

In the Function Report section of his application for benefits, Plaintiff described his daily activities as, rising early, making coffee, watching television for several hours, intermittently doing exercises for his knee and back pain, sitting or walking in the yard, preparing  a sandwich for lunch and trying to help with dinner preparation.  Plaintiff estimated he did about 5% of the cleaning in the home.  Plaintiff vacuums, wipes off the table, takes out trash and performs other light chores.  Plaintiff goes shopping twice a month.  (Tr. 300-310.)  In the Disability Report section, Plaintiff wrote that he was 6 feet tall and weighed 230 pounds.  He estimated he could walk 10-15 minutes at most, sit for 45 minutes to an hour and that he used a brace and a cane to walk.  In the Disability Appeal form requesting a hearing before an ALJ, Plaintiff listed his current medications as oxycodone, gabapentin, and ibuprofen for pain, pravastatin for allergy symptoms, ranitidine for heart burn, and metropolol for high blood pressure.  (Tr. 344-360.)

III.    **ALJ's Decision**

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011. (Tr. 53.) He determined that Plaintiff had not engaged in substantial gainful activity since August 9, 2007, the alleged onset date of disability. (Tr. 53.) Plaintiff alleged disability due to injuries to his back, neck, right knee, and foot, high blood pressure, breathing problems, and problems with his right arm and shoulder. (Tr. 289.) The ALJ found that Plaintiff had the severe impairments of tendonitis of the right shoulder, a medial meniscus tear of the right knee, and degenerative disc disease; but he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 53.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work except he cannot more than occasionally climb ramps and stairs, stoop, kneel, climb ropes, ladders, and scaffolds, crouch, crawl, lift overhead with the right arm, work at unprotected heights, and work with or around industrial hazards. (Tr. 53.) The ALJ also found that Plaintiff would require employment that allowed him to alternate between sitting and standing frequently, as well as the ability to use a cane part of the time to aid in ambulation. (Tr. 53-54.) Based on the RFC, the ALJ also determined that Plaintiff is unable to perform any past relevant work, but that considering his age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 53-54 & 56.)

Plaintiff argues that the ALJ's decision should be reversed because the ALJ (1) improperly discredited his testimony and the testimony of Crystal Marie Stout, (2) failed to give proper controlling weight to the opinion of the treating physicians, (3) made a RFC finding that was not supported by evidence in the record, and (4) failed to present a hypothetical to the VE that encompasses all of his impairments.  The Commissioner asserts that the ALJ's decision is supported by substantial evidence in the record as a whole and should be affirmed.

## IV.  Administrative Record

The following is a summary of relevant evidence before the ALJ:

### A.  Hearing Testimony

At the hearing the ALJ heard testimony from Plaintiff, Crystal Marie Stout, and the VE, Delores Gonzalez.  Plaintiff was represented by counsel.  (Tr. 67-143.)

#### 1.  Plaintiff's Testimony

Plaintiff testified as follows.  Plaintiff attended high school through the 10th grade. He is currently receiving food stamps, Medicaid, and has a pending Worker's Compensation settlement.  He won a previous Worker's Compensation award in the amount of $68,000 for injuries to his neck, but only received medical reimbursement because the employer was uninsured and went out of business.

In August of 2007, while he worked as an electrician, Plaintiff tore the meniscus in his right knee.  (Tr. 108-109.)  Because of this, he has been wearing a brace since late 2007 or early 2008 anytime he leaves the house.  (Tr. 92, 94.)  Plaintiff uses a cane that his physical therapist prescribed.  (Tr. 92-93.)  He is able to walk with his brace and cane.

(Tr. 95.)  Plaintiff had two surgeries performed on his right knee each about a year apart.
(Tr. 93.)  He underwent the second surgery because an MRI still showed a tear and his
condition had worsened since the last surgery.  (Tr. 110.)  Plaintiff was released from his
last knee surgery around March 2010 and his restrictions remained the same.  (Tr. 93.)
However, he still has a torn meniscus and is still in severe pain.  (Tr. 93, 110.)

   Plaintiff's right shoulder was frozen and he began the first of three injections in
the shoulder on April 10, 2010, but he has never had surgery on it.  (Tr. 95-96.)  Plaintiff
also has complications with his lower back and hip but has not had surgery on them.  (Tr.
96.)  The lower back injury occurred the day after his initial knee injury on concrete
steps; he testified that he is in constant pain at a level between 4 and 5, and a severe level
between 8 and 9.  (Tr. 109, 111-112.)  In 2009, an MRI showed a bulge at L4/S1 and a
protrusion at L4 but no large herniation.  (Tr. 96.)  Plaintiff was prescribed oral steroids,
sleep aids, and pain medication for his back and he wears a Tens unit twice a day after his
in home therapy sessions.  (Tr. 96-97.)  Plaintiff uses a prescription Lycaderm patch on a
day to day basis.  (Tr. 114.)  Plaintiff testified that he takes the pain medication about
three times a day or more depending on his pain level.  (Tr. 97-98.)  Side effects from his
pain medication include dizziness and tiredness.  (Tr. 97-98.) The side effects of the
medication require him to lie down sometimes for three to four hours, and he finds
himself having to lay down three to four times a week.  (Tr. 113.)  The medication also
causes skin irritations.  (Tr. 102.)  Plaintiff testified he has physical therapy for his back
and knee and he is currently participating in home therapy and asking for pain

management for his knee.  (Tr. 114-115.)  He smokes cigarettes but does not drink
alcohol or use illegal drugs.  (Tr. 103.)

 Plaintiff also noted that he has shooting pains in his neck from an injury to the C7
area where he was struck in the head with a crowbar and was diagnosed with post-
concussion syndrome.  (Tr. 98, 116.)  He has not had surgery on his neck but an MRI
showed a problem with his vertebrae.  (Tr. 98.)  Plaintiff suffers from severe allergies to
mold and will be treated by weekly injections for a period of two years.  (Tr. 99.)  He has
high cholesterol, hearing difficulties, and high blood pressure controlled by medication.
(Tr. 101.)  Plaintiff testified that he has a constant ringing in his head and that he has
difficulty hearing when several people are speaking, and it also affects his balance.  (Tr.
101-102.)  Plaintiff gets frequent migraine headaches brought on most often by his
posture as well as his stiff neck.  The migraine headaches make it hard to concentrate, but
he has not received any treatment for them.  (Tr. 115-116.)

 Plaintiff noted that he has also been diagnosed with depression and that he is lucky
to get four hours of sleep because of worries and concerns about himself.  (Tr. 117-119.)
At home Plaintiff can drive, but his fiancé does the cooking, dishes, laundry, and
vacuuming except when she is at work and he prepares cans of soup or a sandwich.  (Tr.
104-105.)  Plaintiff testified that he can walk and stand in his home without his brace and
cane for about 10 to 15 minutes.  (Tr. 105-106.)  He mentioned that he can also sit for
about 30 to 40 minutes before he becomes restless.  (Tr. 107.)  Plaintiff stated that his
lifting limitation is 30 pounds, but problems with his shoulder began February 28, 2009
and have been getting worse.  (Tr. 107-108.)  He felt that in a test measuring the lifting

7

power of more than just his knee, he would occasionally be able to lift 20 pounds.  (Tr. 119-120.)

## 2.    Testimony of Crystal Marie Stout

Crystal Marie Stout ("Ms. Stout") testified as follows.  Ms. Stout is Plaintiff's fiancée and she has been living with him for about a year and a half.  (Tr. 122.)  Plaintiff drives on occasion but the only time he really leaves the house is to grocery shop at Wal-Mart with Ms. Stout, and while there he pushes the cart but they need to stop occasionally.  (Tr. 124-125.)  Sometimes Plaintiff will help around the house such as vacuuming or cleaning the cat's litter box, but that is the extent of his assistance.  (Tr. 126, 127-128, 129.)  Plaintiff discontinued other activities such as cooking after his second surgery, which Ms. Stout believes made his disabilities worse.  (Tr. 126-127.)  Ms. Stout testified that Plaintiff never walks without a brace and occasionally uses the cane inside.  (Tr. 127.)  Plaintiff has difficulty with personal care items such as putting on his belt or tying his shoes, and it is difficult for him to clean himself.  (Tr. 128-129, 134-135.)  Plaintiff does exercises for his condition such as bending his knee, stretching, and lifting his arms as high as possible, which is about shoulder height.  (Tr. 129-130, 134.)  Ms. Stout also testified that Plaintiff has trouble sleeping at night, and gets four or five hours of sleep a night if he is lucky and he takes naps most days.  (Tr. 131- 132.)  She testified that during the night Plaintiff will make painful noises and she'll have to get his pain medication which causes side effects such as dizziness and drowsiness, but he takes pain medication each day.  (Tr. 132-133.)  Ms. Stout stated that she can see when Plaintiff is feeling depressed and he'll begin to sound really upset.  (Tr. 135-136.)

8

### 3.      Testimony of VE Delores Gonzalez

VE Delores Gonzalez testified as follows.  Plaintiff's work as a telemarketer was classified as sedentary and semi-skilled, and all other positions he held were classified at the medium or heavy exertional level.  (Tr. 138-139.)   The ALJ asked the VE to consider a  hypothetical individual with Plaintiff's training, education, and work experience who could perform light work with the following limitations: climb stairs and ramps occasionally; never climb ropes, ladders, or scaffolds; stoop, kneel, and crouch, occasionally; never crawl; ambulates with a cane, but at the worksite would be able to stand and sit without the use of the cane; could do some ambulation without a cane; would never be able to reach or lift overhead with the right arm and must avoid hazards or heights.  The VE determined such an individual would be able to perform Plaintiff's past work as a telemarketer.  (Tr. 139.)  There are 307,730 telemarketer jobs nationally; 9,490 jobs in Missouri; and 4,960 in the St. Louis Metropolitan area.  (Tr. 140.)  The VE testified that the hypothetical individual would also be able to work as an order caller, a position that is light and unskilled, with 2,906,600 positions nationally, 77,940 positions in Missouri, and 35,230 positions in the St. Louis Metropolitan area.  (Tr. 140.)

The VE testified that if the first hypothetical were changed to include a sit/stand option at the work site with the ability to change position frequently, and the individual could never kneel or crouch but could stoop, the hypothetical individual could still perform the telemarketer and order caller positions.  (Tr. 140.)  If this hypothetical individual needed at least three additional breaks beyond the normal two breaks and a lunch break, the individual would not be able to participate in competitive employment

because of the need to be accommodated.  (Tr. 141.)  The VE also testified that if the individual had difficulties hearing, that would not preclude the employment because there are applications that can be placed to increase phone volume and therefore this disability would not eliminate the telemarketer position.  (Tr. 141-142.)  However, if the hypothetical individual was required to lie down on a daily basis for one to three hours, this condition would preclude competitive employment.  (Tr. 142.)

### B.    Medical Evidence

#### 1.    Knee

On August 13, 2007, Plaintiff visited Dr. James Mayer regarding right knee pain. (Tr. 702.)  Dr. Mayer ordered Plaintiff to continue taking Naprosyn as directed, receive three physical therapy treatments, wear a knee sleeve when walking, and apply ice to the knee twice daily.  (Tr. 702.)  Dr. Mayer limited Plaintiff to lifting 20 pounds, working on the ground level, and refraining from driving a work truck until his next visit.  (Tr. 702.)

On August 31, 2007, an MRI of the right knee showed pre-patellar soft tissue swelling and a horizontal tear medial meniscus[2] associated with a small meniscal cyst. (Tr. 372.)  On September 5, 2007, an MRI of the right foot showed no evidence of fracture or dislocation.  (Tr. 371, 378.)  On October 1, 2007, Physical Therapist Shawn Heck reported to Dr. Theodore Rummel that Plaintiff attended seven therapy sessions for his knee and 18 visits for his knee and lower back.  (Tr. 520.)  Heck noted that Plaintiff

---

[2] Medial Meniscus is the "middle or center" of the "fibrocartilage" "of the knee." Stedman's Medical Dictionary 1076, 1091 (27th ed. 2000).

had difficulty tolerating passive range of motion of the knee joint and self-stretching, but Plaintiff had progressed to ambulation without his cane.  (Tr. 520.)

On October 22, 2007, Dr. Theodore Rummel performed a diagnostic operative arthroscopy of the right knee with partial lateral meniscectomy.[3]  (Tr. 519.)  Dr. Rummel examined Plaintiff on October 30, 2007 for post-surgical follow-up and placed him on a non-work status for two weeks.  (Tr. 455.)  On November 15, 2007, Dr. Rummel examined Plaintiff and indicated that Plaintiff could perform desk duty at work.  (Tr. 454.)  Dr. Graven instructed Plaintiff to continue physical therapy and referred him for a pain management evaluation.  (Tr. 452.)  Dr. Graven restricted Plaintiff to sedentary light duty desk type work for thirty days.  (Tr. 452.)

On February 12, 2008, Dr. Rummel opined that Plaintiff had reached maximum medical improvement for his right knee.  (Tr. 446.)  Dr. Rummel found that Plaintiff had full range of motion with some discomfort in the medial portal scar tissue.  (Tr. 446.)  Plaintiff's strength was 4+ out of 5, he had normal girth of the quad and calf with no instability to varus or valgus stress anterior or posterior, and he had 30 degrees of flexion and full extension.  (Tr. 444.)  Dr. Rummel opined that Plaintiff's permanent impairment was 10% of his right lower extremity due to partial lateral meniscectomy.  (Tr. 444.)

Plaintiff visited St. Peters Bone & Joint Surgery for physical therapy from September 27, 2007 to February 28, 2008.  (Tr. 725-732.)  An MRI of Plaintiff's knee, performed on March 19, 2009, showed a small tear of the posterior medial meniscus and

---

[3] Lateral Meniscectomy is a "side" "excision of a meniscus, usually from the knee joint." Stedman's Medical Dictionary 968, 1091 (27th ed. 2000).

a truncated appearance of the posterior aspect of the lateral meniscus, which suggested an old injury or tear.  (Tr. 601.)  There was no cortical fracture, dislocation, or bone destruction.  (Tr. 601.)  On May 26, 2009, Dr. Truett Swaim prepared an opinion letter directed to Plaintiff's legal counsel regarding Plaintiff's right knee problems.  (Tr. 617-619.)  Based upon his review of Plaintiff's medical records and a letter from Plaintiff, Dr. Swaim opined that Plaintiff should undergo repeat right knee arthroscopy related to Plaintiff's August 9, 2007 injury.  (Tr. 619.)

On August 7, 2009, Plaintiff visited Dr. Matthew Collard for an independent medical evaluation of his right knee injury.  (Tr. 905-911.)  After a physical examination and a detailed review of Plaintiff's medical records post August 2007, Dr. Collard opined that Plaintiff would benefit from further orthopedic treatment including a right knee diagnostic arthroscopy.  (Tr. 911.)  Dr. Collard found that Plaintiff had exhausted conservative treatment therapies, including physical therapy.  (Tr. 911.)  Dr. Collard also opined that Plaintiff will have a continued permanent partial disability after the proposed surgery, but the disability would be reduced.  (Tr. 911.)  Dr. Collard opined that without an additional surgery Plaintiff would be unable to return to work in his current job capacity.  (Tr. 911.)  On October 12, 2009, Dr. Collard performed a right knee arthroscopy and medial meniscal repair.  (Tr. 912-913.)  After the surgery, Dr. Collard determined that Plaintiff could return to work with limitations on October 21, 2009 with the following limitations: no weight bearing on his lower extremities, no pivoting or squatting, and limited standing and ambulating.  (Tr. 900.)

Plaintiff attended physical therapy for his right knee between November 13, 2009 and January 12, 2010.  (Tr. 864-878.)  Dr. Collard examined Plaintiff on February 3, 2010.  (Tr. 887-888.)  The physical examination showed that Plaintiff's active range of motion was 120 degrees of flexion, no signs of ligamentous instability, and no tenderness over posterior joint line.  (Tr. 887.)  Plaintiff had mild tenderness of his hamstring, calf, anterior lateral and medial capsule as well as patella.  (Tr. 887.)  Dr. Collard noted that Plaintiff continues to do poorly with significant subjective complaints of popping and clicking in the anterior portion of his knee as well as burning over his patella.  (Tr. 887.)  Plaintiff also reported tingling, constant pain, and difficulty sleeping.  (Tr. 887.)  Dr. Collard also noted poor progress in physical therapy.  (Tr. 887.)  Dr. Collard opined that Plaintiff had not been giving the appropriate effort in physical therapy or in his recovery. (Tr. 887.)

On March 4, 2010, Plaintiff had a functional capacity evaluation ("FCE").   (Tr. 883.)  After review of the FCE, work duty, and Plaintiff's most recent physical examination, Dr. Collard opined that he had reached maximum medical improvement and released him from care.  (Tr. 883-884.)  Dr. Collard stated that the FCE showed that Plaintiff gave varied and submaximal effort and exaggerated pain symptoms.  (Tr. 883.)  Plaintiff also refused certain portions of the testing.  (Tr. 883.)  Dr. Collard found that Plaintiff had shown overall slow recovery with his physical therapy and continued to have significant subjective complaints, including popping and clicking in the anterior portion of the knee, burning over his patella, and some tingling in his calf.  (Tr. 883.)  Dr. Collard ordered that Plaintiff continue his restrictions for his right lower extremity.  (Tr.

13

884.)  On April 1, 2010, Dr. Collard released Plaintiff to work without restrictions.  (Tr. 882.)

An MRI of Plaintiff's lower leg from April 2, 2010 showed a stable horizontal tear posterior horn medial meniscus, truncated appearance of lateral meniscus likely due to prior surgery or chronic tear, but no acute abnormality.  (Tr. 860.)  On January 28, 2011, Dr. Adam LaBore performed an electrodiagnostic evaluation of right lower extremity radiculopathy versus neuropathy.  (Tr. 1063.)  The evaluation showed reduced amplitude of the right peroneal motor nerve with all remaining nerves within normal limits, no evidence of generalized peripheral neuropathy in the right lower extremity, and no evidence of radiculopathy in the right lower extremity.  (Tr. 1063.)

On December 23, 2011 an MRI showed partial meniscectomy of the lateral meniscus, a new tear of the free edge of the posterior horn of the medial meniscus as compared to prior MRI from April 2, 2010, and mild chondromalacia patella of the medial patellar facet.  (Tr. 1237.)

## 2.    Back

On November 29, 2007, after examination, Dr. Graven diagnosed Plaintiff with exacerbation of degenerative disc disease and lumbar spondylosis.[4]  (Tr. 452.)  On December 13, 2007, Plaintiff visited Dr. Michael Boedefeld at Pain Management Services for a lumbar epidural steroid injection.  (Tr. 381-384.)  Plaintiff reported pain that radiates from his back down to his legs and right foot.  (Tr. 381.)  Plaintiff described

---

[4] Spondylosis is "stiffening or fixation of a joint" "of the vertebra." Stedman's Medical Dictionary 90, 1678 (27th ed. 2000).

the pain as shooting, dull, sharp, and burning.  (Tr. 381.)  Dr. Boedefeld diagnosed Plaintiff with lumbar degenerative disc disease at L3-4 and L5-S1, lumbar radicular pain in the right leg, and lumbar spondylosis.  (Tr. 384.)  Plaintiff received four epidural steroid injections from Dr. Boedefeld between December 2007 and January 2008.  At his January 10, 2008 appointment Plaintiff reported 25% pain improvement from the medications and 10% pain improvement from the steroid injections.  (Tr. 388.)

On January 31, 2008, Plaintiff visited Dr. Graven and reported that he was feeling a little better, but there was a "knot" in his lumbar.  Dr. Graven scheduled Plaintiff for physical therapy and restricted him to seated work for 3 to 4 weeks.  (Tr. 447.)

On March 27, 2008, Plaintiff visited Dr. Graven and reported that he was okay, but was unable to do work hardening, because it was thirty-eight miles away -- a long ride.  (Tr. 443.)  Dr. Graven ordered a functional capacity evaluation and ordered Plaintiff to continue work hardening.  (Tr. 443.)  Plaintiff visited Dr. Rummel on March 28, 2008 and Dr. Rummel found he was essentially unchanged since his last visit.  (Tr. 442.)  Dr. Rummel recommended that if light duty was unavailable, Plaintiff should do work hardening.  (Tr. 442.)

Plaintiff also attended Excel Physical Therapy from October 1, 2007 to April 2, 2008.  (Tr. 703-724.)  Plaintiff was discharged from Excel and transferred to a work hardening program, because he had not achieved his goals in physical therapy.  (Tr. 703.)  At the time of his discharge in April 2008, Plaintiff was still unable to work.  (Tr. 703.)  On April 9, 2008, Dr. Graven limited Plaintiff to a light to medium physical demand level

and 30 pound weight limit.  (Tr. 464.)  Dr. Graven noted that if no such work was available, Plaintiff would be unable to work.

On October 1, 2008, Plaintiff visited Dr. Pete Montgomery complaining of severe back pain.  (Tr. 564-573.)  Dr. Montgomery diagnosed Plaintiff with hypertension and degenerative joint disease.  Dr. Montgomery found that Plaintiff's back pain continued and although the medication was helping, he might need to have surgery.  (Tr. 567.)

On April 29, 2009 Dr. Fernando Egea examined Plaintiff and recommended physical therapy and pain management.  (Tr. 625.)  Dr. Egea noted that there was limitation in the flexion and extension of the right knee and spasm and limitation of range of motion of the lumbar spine.  (Tr. 625.)  On June 5, 2009, Physical Therapist Amy Vacek provided Dr. Egea a discharge note regarding Plaintiff's discharge from physical therapy.  (Tr. 620.)  Plaintiff received 13 sessions of physical therapy and responded fairly to therapeutic intervention.  (Tr. 620.)  Vacek recommended that Plaintiff be discharged from formal physical therapy and begin an independent home exercise program with use of Tens[5] and a referral to pain management.  (Tr. 620.)  Vacek noted that Plaintiff did not tolerate prone extension with increased low back pain and attempts at mobilization were also performed with poor tolerance and increased pain and were

---

[5] Tens is a self-operated portable device used to treat chronic pain by sending electrical impulses through electrodes placed over the painful area.  http://dictionary.reference.com

stopped.  (Tr. 620.)  Plaintiff reported to his physical therapists that he had constant lower back pain and with intermittent sciatica[6] to his ankle, and left gluteus[7] pain.  (Tr. 620.)

On May 24, 2010 Plaintiff visited the Emergency Room of St. Joseph Hospital West for an overnight stay with a complaint of chronic low back pain that was worse than usual.  (Tr. 778.)  He was diagnosed with urine and stool incontinence, and lumbar radiculopathy[8].  (Tr. 781.)  An MRI of Plaintiff's lumbar spine showed no interval change, no large disc herniation, canal stenosis or cord compression, but did show a mild degenerative narrowing spinal canal at L4-L5.  (Tr. 790.)

Plaintiff returned to Dr. LaBore on June 24, 2010 with complaints of lower back pain radiating to his lower extremity.  (Tr. 811-813.)  Dr. LaBore diagnosed Plaintiff with symptoms of lumbar radiculopathy with multilevel degenerative disc changes and facet arthropathy[9], mild stenosis at L4-5.  (Tr. 812.)

On January 18, 2011, an x-ray was taken of Plaintiff's pelvis and lumbar spine. (Tr. 952.)  The x-ray showed that there was no fracture of the pelvis and the hip joint spaces were normal.  (Tr. 952.)  There was no fracture of the lumbar spine and the

---

[6] Sciatica is "pain in the lower back and hip radiating down the back of the thigh into the leg" . . . usually due to herniated lumbar disc compromising a nerve root, most commonly the L5 or S1 root.  Stedman's Medical Dictionary 1602 (27th ed. 2000).

[7] Gluteus is a muscle of the buttocks.  Stedman's Medical Dictionary 1147 (27th ed. 2000).

[8] Lumbar Radiculopathy is a "disorder of the spinal nerve roots" relating to "the loins or the part of the back and sides between the ribs and the pelvis."  Stedman's Medical Dictionary 1034, 1503 (27th ed. 2000).

[9] Arthropathy is "any disease affecting a joint." Stedman's Medical Dictionary 150 (27th ed. 2000).

17

alignment was normal.  (Tr. 952.)  The spine's motion was normal with flexion and extension.  (Tr. 952.)  There was mild degenerative disc disease at L3-4.  (Tr. 952.)

### 3. Shoulder

On March 4, 2009, Plaintiff visited St. Joseph Hospital West Emergency Room and reported injury to his right shoulder after falling at work.  (Tr. 588.)  An x-ray showed no fracture or dislocation of his shoulder.  (Tr. 591.)  Plaintiff was discharged the same day and ordered to use hydrocodone and Naprosyn, apply ice or heat to the area as needed, and minimize lifting with his arm, but to move to prevent stiffness.  (Tr. 592.)  An MRI of Plaintiff's right shoulder on March 19, 2009 confirmed there was no fracture dislocation or bone destruction.  (Tr. 600.)

Dr. LaBore began treating Plaintiff on September 3, 2009 for complaints of right shoulder pain that he had been having since February 2009.  (Tr. 808.)  Dr. LaBore diagnosed Plaintiff with frozen shoulder syndrome and gave him an intra-articular corticosteroid injection and anesthetic injection.  (Tr. 809.)  Plaintiff received a guided right glenohumeral injection as part of conservative therapy for his frozen shoulder on March 26, 2010.  (Tr. 838.)  A shoulder x-ray from March 26, 2010 showed that the glenohumeral and acromioclavicular ("a.c.") joints were normal.  (Tr. 840.)  Plaintiff's alignment was normal and there was no fracture or bone abnormality.  (Tr. 840.)

Dr. LaBore referred Plaintiff to physical therapy for evaluation of his frozen shoulder and he was evaluated on May 20, 2010.  (Tr. 819.)  Physical Therapist Lisa Springer provided Plaintiff instruction in a progressive home exercise program and recommended that he utilize his ice pump and tens unit after completing three sessions

each day.  (Tr. 819.)  On July 7, 2010, Dr. LaBore gave Plaintiff a fluoroscopically guided right glenohumeral injection for the pain in his right shoulder.  (Tr. 839.

Plaintiff had an MRI of his right shoulder on January 28, 2011, which showed a right superior labral tear extending anterior to posterior, referred to as a SLAP lesion. (Tr. 945-946.)  An x-Ray of the right knee from March 22, 2011 showed normal joint spaces and normal alignment with no fractures.  (Tr. 941.)  An x-Ray of the right shoulder performed April 5, 2011 showed an unchanged normal right shoulder radiographs and mild bilateral C4-5 and C5-6 uncovertebral joint osteoarthritis without neuroforaminal narrowing.  (Tr. 936.)

On April 15, 2011, Dr. LaBore performed an electro diagnostic evaluation of neuropathy and radiculopathy for Plaintiff's right shoulder.  (Tr. 1049.)  Dr. LaBore found evidence of mild ulnar neuropathy at the elbow, appearing to be clinically insignificant, normal study otherwise, no evidence of neuropathy, and no evidence of cervical radiculopathy.  (Tr. 1049.)

### 4.    Dr. Smith

Dr. Matthew Smith began treating Plaintiff in March 2011, regarding his right shoulder and right knee pain.  (Tr. 1004-1006.)  Dr. Smith diagnosed Plaintiff with right knee pain and right shoulder pain that is likely related to a.c. joint arthritis and possibly a SLAP tear.  (Tr. 1005.)  Dr. Smith gave Plaintiff an injection in his a.c. joint.  (Tr. 1006.) Plaintiff visited Dr. Smith again in April and May 2011.  (Tr. 998-1003.)  Plaintiff reported that he received 25-50% relief from injections into his shoulder joint and a 50% relief from an injection into his a.c. joint.  (Tr. 998.)

Plaintiff had a nuclear medicine myocardial stress examination done June 2, 2011 which showed no abnormality. (Tr. 1218.) On June 6, 2011, Dr. Smith performed three procedures on Plaintiff, which included (1) a right shoulder open distal clavicle excision, (2) arthroscopic biceps tenotomy, and (3) a subacromial decompression. (Tr. 930.) Plaintiff visited Dr. Smith for post-surgical follow-up in June, July, and September 2011. (Tr. 993-997.) Dr. Smith prescribed physical therapy for Plaintiff. (Tr. 997.) Dr. Smith noted that he would not re-fill Plaintiff's pain medication and if the pain persisted he would refer him to pain management. (Tr. 995.) After a physical examination on September 23, 2011, Dr. Smith noted that Plaintiff's right shoulder range of motion was 0-150 degrees, with a 4+/5 strength with supraspinatus testing and 5/5 strength with external rotation testing. (Tr. 993.) Dr. Smith noted that he had a mild biceps deformity, decreased sensation of the ulnar distribution, and decreased grip strength. (Tr. 993.) Dr. Smith recommended that Plaintiff work on strengthening and range of motion exercises on his own. (Tr. 993.) On December 16, 2011, Dr. Smith found that Plaintiff had mild improvement with the scapular cyst test with his anterolateral shoulder pain. (Tr. 987.) Dr. Smith recommended that Plaintiff try to get physical therapy covered by his insurance. (Tr. 987.)

## 5.    Dr. Buckles

Plaintiff visited Dr. Richard Buckles on May 27, 2009 with multiple non-specific complaints. (Tr. 859.) Plaintiff reported difficulty sleeping, right leg pain, and low back pain. (Tr. 859.) Plaintiff visited Dr. Buckles four times between June and August 2009, with no new complaints. (Tr. 857-858.) Plaintiff visited Dr. Buckles three times for

treatment of hypertension and a rash, allergy testing, and general check-ups between October and December 2009.  (Tr. 852-854.)

Plaintiff continued to receive treatment from Dr. Buckles each month between February 2010 and November 2011.  (Tr. 846-851, 961-978.)  Dr. Buckles noted that he had nothing to offer Plaintiff, but pain control.  (Tr. 848.)  During his treatment with Dr. Buckles, Plaintiff consistently complained of pain in his knee, back, and shoulder.  (Tr. 847-850, 962-968, 971-973, 975-977.)  Dr. Buckles continued to re-fill Plaintiff's prescriptions for pain medication, because none of Plaintiff's other doctors would give him pain medication.  (Tr. 851.)

On July 23, 2010, Dr. Buckles prepared an opinion letter for Plaintiff.  Dr. Buckles stated that he had treated Plaintiff since March 16, 2009.  Dr. Buckles noted that Plaintiff has received treatment and surgery for his shoulder, right knee, and back without any success.  (Tr. 914.)  Dr. Buckles opined that due to Plaintiff's chronic pain and inability to work, Plaintiff has become quite depressed and placed on medication.  (Tr. 914.)  Dr. Buckles opined that overall Plaintiff was disabled due to his multiple orthopedic problems coupled with depression.  (Tr. 914.)  Dr. Buckles found that Plaintiff was unable to ambulate without assistive devices, nor was he able to carry on any meaningful work due to the injury and chronic orthopedic issues and treatment at this point was basically pain control.  (Tr. 914.).  Dr. Buckles concluded that Plaintiff is completely disabled, which is probably lifelong.  (Tr. 914.)

### 6.    Hearing

On July 30, 2009, Clinical Audiologist Erin T. Meara evaluated Plaintiff for complaints of tinnitus[10] and hearing loss.  (Tr. 916.)  Meara determined that Plaintiff had a mild to severe high frequency sensorineural hearing loss bilaterally.  (Tr. 916.)  She opined that he was an excellent candidate for hearing aids in both ears.  (Tr. 916.)

### 7.    Depression

In 2010 and 2011, Dr. Buckles opined that Plaintiff was depressed due to his medical issues and prescribed medication for the depression.  (Tr. 847-848, 850-851, 961-978.)  Dr. David Goldmeier, psychiatrist, began treating Plaintiff on August 11, 2011.  Dr. Goldmeier diagnosed Plaintiff with recurrent major depressive disorder, unspecified and possible panic disorder without agoraphobia.  (Tr. 1223, 1225-1228, 1230.)  Dr. Goldmeier assessed Plaintiff's global assessment functioning[11] in a range of 48 to 50 between August 2011 and January 2012.  (Tr. 1223, 1225-1228, 1230.)

---

[10] Tinnitus is noise "(ringing, whistling, hissing, roaring, booming, etc.) in the ears." Stedman's Medical Dictionary (need page number) 1838 (27th ed. 2000).

[11] Global Assessment Functioning is a clinician's judgment of the individual's overall level of functioning, and represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

### 8.    April 2008 Functional Capacity Assessment

On April 4, 2008, Bill Meirink, licensed occupational therapist, and physical therapist Kari Bolds completed a FCE for Plaintiff.  (Tr. 399-438.)  Meirink and Bolds determined that Plaintiff could do more physically at times than was demonstrated during testing.  (Tr. 399.)  Meirink found that based on test findings and clinical observations, Plaintiff's subjective reports of pain were simply unreliable and inaccurate.  (Tr. 400.)  Bolds noted that Plaintiff gave submaximal effort with objective testing as evidenced by odd behaviors with range of motion testing, cogwheel movements with strength testing, signs of symptom magnification evidenced by jerking movements with light palpitation of lumbar spine and clinically significant Waddell's findings.  (Tr. 402.)  Plaintiff reported that he could not honestly do his job and that bending, reaching, and crawling were too difficult for him.  (Tr. 400.)

### 9.    Physical RFC Assessment

A single decisionmaker Angela Bennett completed a Physical RFC Assessment for Plaintiff on April 7, 2009.  (Tr. 610-615.)  Bennett determined that Plaintiff had supraspinatus tendinosis of the right shoulder and tear of posterior medial meniscus of the right knee.  (Tr. 610.)  Bennett found that Plaintiff did not have any visual or communicative limitations.  (Tr. 612-613.)  Bennett also found that Plaintiff could occasionally lift twenty pounds and frequently lift 10 pounds; stand and/or walk and sit 6 hours in an 8 hour workday; and was limited in pushing or pulling in lower extremities.  (Tr. 611.)  Bennett also determined that Plaintiff could only occasionally balance, but could frequently climb, stoop, kneel, crouch, and crawl.  (Tr. 612.)  She found that

Plaintiff was limited in reaching in all directions and had to avoid concentrated exposure to machinery and heights, specifically climbing ladders due to shoulder pain.  (Tr. 613.)

## V.    Legal Standard

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled.  20 C.F.R. §§ 404.1520(a), 416.920(a).  First, the claimant must not be engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a), 416.920(a).  Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, the claimant must establish that the impairments prevents him or her from doing past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(e).  At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).  If the claimant satisfies all of the criteria under the

five step evaluation, the ALJ will find the claimant to be disabled.

20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

This Court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g). Substantial evidence is less than preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision.  *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  Therefore, even if this Court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence.  *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984).  An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.  *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997.)

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

1. Findings of credibility made by the ALJ;
2. The education, background, work history, and age of the claimant;
3. The medical evidence given by the claimant's treating physicians;
4. The subjective complaints of pain and description of the claimant's physical activity and impairment;
5. The corroboration by third parties of the claimant's physical impairment;
6. The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
7. The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

**VI.    Discussion**

Plaintiff asserts four errors on appeal.

### A.    Treating Physician Evidence

The Court first addresses the ALJ's determination that the opinion of Dr. Buckles, a treating physician, regarding Plaintiff's disability was entitled to little weight.  Dr. Buckles opined that Plaintiff was unable to work permanently.  In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence in the record."  20 C.F.R. § 404.1527(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole."  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).  A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in the case record.  20 C.F.R. §

404.1527(c)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937.  In giving a treating

physician's opinion controlling weight, the ALJ defers to a treating physician's medical

opinions about the nature and severity of an applicant's impairments, including

symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the

impairment, and the resulting restrictions.  20 C.F.R. 404.1527(c)(2); *Ellis v. Barnhart*,

392 F.3d 988, 995 (8th Cir. 2005).  A medical source's opinion that a claimant is

"disabled" or "unable to work" does not require the Commissioner to make a finding of

disability.  20 C.F.R. § 404.1527(d)(1).  The determination of whether a claimant is

disabled is reserved for the Commissioner.  20 C.F.R. § 404.1527(d)(3).

"It is the ALJ's function to resolve conflicts among the opinions of various

treating and examining physicians."  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir.

2007).  "The ALJ may reject the conclusions of any medical expert, whether hired by the

claimant or the government, if [the conclusions] are inconsistent with the record as a

whole."  *Id.*  Moreover, the social security regulations specifically state that more weight

generally is given to a specialist's opinion about medical issues related to his or her area

of specialty than to the opinion of a source who is not a specialist. 20 C.F.R.

§ 404.1527(c)(5).

The ALJ states in his opinion that Dr. Buckles' opinion is inconsistent with the

treatment notes of the treating orthopedic specialist and the record as a whole.  (Tr. 56.)

The ALJ properly considered that Dr. Buckles was an internist and noted that his medical

opinions directly contradicted the medical specialists, including Dr. Rummel, Dr. Graven,

27

and Dr. Collard who all opined at different times that Plaintiff could work with or without restrictions.  Further, Dr. Buckles prescribed Plaintiff pain medication despite the fact that all of his other doctors refused to give him any additional medication.  (Tr. 851.)  Dr. Buckles acknowledged in his treatment notes that the only thing he could do for Plaintiff was to offer pain control.  (Tr. 848.)  There is no evidence in Dr. Buckles' treatment notes that he provided any treatment other than pain medication for Plaintiff's back, shoulder, or knee injuries.  Finally, a determination that a claimant meets the requirements for disability insurance benefits under the Social Security Act is reserved to the Commissioner.  The ALJ is not required to make a finding of disability for the sole reason that a claimant's doctor alleges that he is permanently disabled.  *See* 20 C.F.R. § 404.1527(d)(1).  Based on the foregoing, the ALJ's determination that Dr. Buckles' opinion was entitled to little weight is supported by substantial evidence in the record as a whole.

### B.    Credibility Determination

Plaintiff next asserts that the ALJ improperly discredited both his and Ms. Stout's testimony, because the ALJ did not make any findings specifically discrediting Plaintiff's testimony about his physical limitations, failed to mention the side effects of Plaintiff's medication, and chose isolated references in the medical record to discredit him.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  *Polaski v. Heckler*, 739 F.2d 1320, 1322

(8th Cir. 1984).  A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them.  *Id.*  The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
> (3) any precipitating or aggravating factors;
> (4) the dosage, effectiveness, and side effects of any medication; and
> (5) the claimant's functional restrictions.

*Id.*  "Whether or not a[n] explanation for the pain can be given, it is nevertheless possible that the claimant is suffering from disabling pain."  *Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir. 1984).

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005), *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).  "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Masterson,* 363 F.3d 738.  The ALJ, however, "need not explicitly discuss each *Polaski* factor."  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ need only acknowledge and consider those factors.  *Id.*  Although credibility determinations are

primarily for the ALJ rather than the Court, the ALJ's credibility assessment must be

based on substantial evidence.  *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988).

The Court agrees that here the ALJ makes a circular argument, asserting that "the

claimant's statements concerning the intensity, persistence, and limiting effects of these

symptoms are not credible to the extent they are inconsistent with the above residual

functional capacity."  (Tr. 56.)  This assertion implies that the ALJ determines the

claimant's RFC and then discredits any statements by the claimant that are inconsistent

with the ALJ's RFC determination.  Such an analysis would clearly be improper, as the

ALJ, in making an RFC determination, is required to consider all of the evidence of the

record, including the claimant's description of his limitations.  *Pearsall v. Massanari*,

274 F.3d 1211, 1217 (8th Cir. 2001).

Despite this circular reasoning, the record indicates that the ALJ considered the

*Polaski* factors although he did not explicitly enumerate them.  The ALJ summarized

Plaintiff's and Ms. Stout's testimony regarding Plaintiff's work history, injuries, daily

activities, and functional limitations.  (Tr. 54.)  The ALJ noted that the RFC was

supported by the doctors' treatment notes, Plaintiff's testimony, and the record as a

whole.  (Tr. 56.)  The ALJ specifically stated:

> The undersigned finds that the evidence contained in the
> record fails to support allegations of a severe and
> debilitating impairment or combination of impairments.
> The treatment notes indicate at best, ailments that
> appear troublesome, but do not impose limitations of
> such significance as to preclude sustained competitive
> employment.  The record establishes that none of the
> claimant's treating physicians have ever recommended
> that he not seek employment during the course of

> treatment, nor is there any evidence that the claimant
> has required prolonged hospitalization.

(Tr. 56.)

"When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaint of pain under the *Polaski* standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson*, 363 F.3d at 738-739. Although the ALJ did not refer directly to the *Polaski* factors, he cited SSR 96-7p, which addresses the same concerns as the *Polaski* factors. (Tr. 54.) Moreover, it is clear from the medical evidence in the record that although Plaintiff reported disabling pain to his doctors, his doctors did not believe him. With the exception of Dr. Buckles, Plaintiff's doctors stopped prescribing pain medication for him. (Tr. 851.) The medical evidence also shows that all of Plaintiff's treating physicians, with the exception of Dr. Buckles, released Plaintiff to return to work. And some treaters opined that Plaintiff was not putting forth full effort. The ALJ further noted that Plaintiff had not required any psychiatric or prolonged hospitalizations or received any significant treatment from a mental health professional. The undersigned finds that these were proper considerations for the ALJ to discount Plaintiff's credibility.

The Court agrees with Plaintiff's assertion that the ALJ summarized Ms. Stout's testimony, but he did not explicitly discount her credibility. A remand may be necessary where an ALJ has failed to explain why a third party's statements or testimony lack

credibility and the reviewing court cannot determine from the record whether the ALJ overlooked the statements, gave them some weight, or completely disregarded them. *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008.)  The Eighth Circuit has directed, however, that remand is not necessary when it is evident that the third party's testimony concerning the claimant is discredited by the same evidence that discredits the claimant's own testimony.  *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011).  In such a situation, a remand is not required based on an arguable deficiency in opinion-writing technique if it has no bearing on the outcome of the case.  *Id.* at 560.  In this case, Ms. Stout's testimony regarding Plaintiff's limitations was quite similar and could be discredited by the same evidence that discredits Plaintiff's testimony.  Although the Court might wish for more discussion by the ALJ to support the credibility determination, the Court concludes that substantial evidence in the record as a whole supports the credibility determination.

## C.     RFC Determination

Plaintiff argues that the ALJ's findings as to his RFC are not supported by evidence in the record because he made no reference to his testimony of his physical limitations including his difficulty with sitting and standing, his need to lie down, or the side effects of his medication.  RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545.  The RFC is a function-by-function assessment of an individual's

ability to do work related activities on a regular and continuing basis.[12]  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.  *Pearsall*, 274 F.3d at 1217.  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is ultimately a medical determination.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional when assessing the RFC. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

The undersigned finds that the RFC determination is supported by substantial evidence in the record as a whole.  The RFC determination specifically referenced that Plaintiff would need employment that would allow him to alternate sitting or standing. The RFC determination also took into consideration that Plaintiff would need the ability to use a cane to aid in ambulation.  Plaintiff testified that he could sit for 30 to 40 minutes and stand or walk for 10 to 15 minutes without his brace.  (Tr. 106-107.)  The only

---

[12] A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  SSR 96-8p, 1996 WL 374184, at *1.

evidence in the record that mentions Plaintiff's need to take naps or lie down is the testimony from Plaintiff and Ms. Stout.  Contrary evidence in the record demonstrates that Plaintiff's physicians released him to light or medium duty work or work with no restrictions during the relevant time period.  In addition, none of the restrictions from his doctors noted that he had to lie down or take naps during the day.  Therefore, the ALJ's RFC determination was supported by substantial evidence in the record as a whole.

### D.    Hypothetical Question

Plaintiff contends that the hypothetical question presented to the VE was improper because it assumed he was able to perform light work, there were inconsistencies in the positions, it assumed his ability to sit and stand, it did not mention pain or medication side effects, and it did not mention his need to lie down during the day.  "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question."  *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  "[T]he ALJ's hypothetical question must include the impairments that the ALJ finds are substantially supported by the record as a whole."  *Id.*  "However, the hypothetical need only include those impairments which the ALJ accepts as true."  *Grissom v. Barnhart*, 416 F.3d 834, 836 (8th Cir. 2005).  A "hypothetical question posed to a vocational expert must capture the concrete consequences of claimant's deficiencies."  *Pickney*, 96 F.3d at 297.

Having determined that the RFC determination is supported by substantial evidence, the Court does not find that the VE's testimony referring to sedentary and light work jobs was inconsistent with the RFC.  A claimant who can perform light work can

34

also perform sedentary work "unless there are additional limiting factors such as loss of dexterity or inability to sit for long periods of time."  20 C.F.R. § 416.967(b).  The hypothetical question posited here included the limitation that Plaintiff would need to alternate between sitting and standing frequently.  In addition, the ALJ need only include in the hypothetical those limitations that are supported by substantial evidence.  On the basis of the foregoing, the Court concludes that the VE's testimony constituted substantial evidence in support of the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.  (Doc. No. 1.)

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 27th day of September, 2013.

35